UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DIVINE ALLAH,

                                    Plaintiff,

                                                              DECISION AND ORDER

                                                              05-CV-6050L

                    v.

THOMAS POOLE, Superintendent
of Five Points Correctional Facility,
Individually and in his Official Capacity,
et al.,


                                    Defendants.

_____


        Plaintiff Divine Allah, appearing *pro se*, commenced this action under 42 U.S.C. § 1983.

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services

("DOCS"), alleges various violations of his constitutional rights during 2003 and 2004, while

plaintiff was confined at Five Points Correctional Facility ("Five Points").

        There are five defendants in this action, all of whom were employed by DOCS at Five Points

at all times relevant to this lawsuit:  Superintendent Thomas Poole; Deputy Superintendent of

Security David Napoli; Sergeant Joseph Keefe; Program Committee Chairman Mark Mogavero; and

Commissary Supervisor Crystal Colvin.[1]   All defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56.

## FACTUAL BACKGROUND

Plaintiff is a wheelchair-bound, English- and Spanish-speaking inmate of Latino descent.[2] In July 2003, shortly after his arrival at Five Points from Green Haven Correctional Facility ("Green Haven"), plaintiff was assigned to the horticulture and commissary work programs.  Complaint ¶ 13. At the commissary, plaintiff sometimes conversed in Spanish with other inmates who were working or making purchases there.

In August 2003, however, defendant Colvin ordered plaintiff and his inmate coworkers at the commissary to stop speaking in Spanish, and to use English only while they were working. Complaint ¶ 18; Colvin Decl. (Dkt. #19) ¶ 6.  Plaintiff alleges that when he asked Colvin the reason for her order, she responded that a DOCS policy prohibited inmates from conversing in Spanish while at work, and that defendants Poole and Napoli had told other supervisors to enforce that policy because "speaking spanish in work areas [presented] a security threat."  Complaint ¶ 19.   At plaintiff's request, Colvin provided him with a copy of the commissary rules, none of which mentioned inmates' use of Spanish, or any other language.  *Id.* ¶¶ 21, 22.

---

[1]Plaintiff's claims against two other defendants, DOCS Commissioner Glenn S. Goord and DOCS itself, were dismissed by the Court on April 25, 2005.  *See* Dkt. #4.

[2]The record does not appear to indicate the nature of plaintiff's disability.

Colvin admits that she told plaintiff and the other inmates to speak English, but claims that she did so on her own initiative, for her own safety, because she was alone in the commissary with the inmates and "was not comfortable having the inmates speak without [her] being able to understand what was being discussed."  Colvin Decl. ¶ 7.  She states that she is unaware of any DOCS directive or policy concerning these matters.  *Id.* ¶ 8.

Plaintiff alleges that in the days immediately following this exchange between him and Colvin, Colvin "suddenly started ordering [plaintiff] to lift" heavy objects such as boxes and mop buckets, despite plaintiff's physical disability.  Complaint ¶ 24.  In addition, plaintiff alleges that several days later, Colvin was informed that plaintiff had filed a grievance (which was ultimately denied, Dkt. #26-2 at 8) about Colvin's refusal to allow him to speak Spanish in the commissary.  Shortly thereafter, plaintiff alleges, he was removed from his job at the commissary and reassigned to an educational program.  Plaintiff alleges that this transfer was ordered in retaliation for his complaints and filing of the abovementioned grievance.  Complaint ¶ 31.  Defendants contend that the transfer was routine for inmates who, like plaintiff, lacked a high school diploma or its equivalent, and that plaintiff was transferred to an educational program as soon as a spot became available for him.  Mogavero Decl. (Dkt. #21) ¶¶ 4-6.

The remaining allegations in the complaint mostly relate to alleged acts of retaliation during a period in 2004 when plaintiff was housed in what he refers to as "8 block."  Complaint ¶ 33.  During the nine months he spent there, plaintiff alleges that he filed grievances about a number of matters, including "the lack of handicap accessibility of his cell," and of officers' unspecified "conduct towards him ... ."  *Id.*  Plaintiff alleges that defendant Keefe was assigned to investigate

many of these grievances, but that Keefe "will not go against his fellow officers," with the result that "the matters were not resolved and many situations escalated." *Id.* ¶¶ 34, 35.  Plaintiff also alleges that because he had been unable to obtain any relief through the grievance procedure, in January 2004 he became a plaintiff in a lawsuit ("ADA action") that had been filed by other wheelchair-bound inmates, asserting claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973.[3]

In September 2004, plaintiff was transferred to Involuntary Protective Custody ("IPC").[4] Complaint ¶¶ 38-40.  Defendants allege that the transfer stemmed from an alleged incident of arson that had occurred at Green Haven involving plaintiff and another inmate, Abdul Shariff, which gave rise to concerns about plaintiff's safety.[5]  *Id.* ¶ 39; Keefe Decl. (Dkt. #20) ¶¶ 4-7.  Plaintiff alleges that the transfer was initiated by Keefe in retaliation for plaintiff's grievances and participation in the ADA action, and that it was based on falsified reports concerning the prior incident.  Plaintiff remained in a hospital ward (presumably because of his disability) in IPC for seventeen days, until, following a hearing, the hearing officer determined that there was no imminent threat to plaintiff's safety warranting IPC confinement.  Dkt. #26-2 at 24.

---

[3]That action, *Shariff v. Goord*, was commenced in the Southern District of New York in September 2003.  In August 2005, the case was transferred to this district, where it is currently pending before District Judge Charles J. Siragusa.

[4]The complaint alleges that this transfer occurred on October 23, 2004.  Complaint ¶ 38. Documents submitted by plaintiff make clear, however, that the correct date is September 23, 2004.  Dkt. #26-2 at 15, 27.

[5]Shariff is also the lead plaintiff in the ADA action.

Based on these allegations, plaintiff asserts two causes of action.  The first alleges that defendants' restriction on plaintiff's use of Spanish while he was working at the commissary violated plaintiff's right to free speech under the First Amendment to the United States Constitution, and that plaintiff's transfer to IPC was in retaliation for plaintiff's filing of grievances and complaints. Complaint ¶ 48.  The second cause of action, which is presumably asserted against the supervisory defendants, alleges their "failure to correct and condemn the tactics of harassment and retaliation" to which plaintiff was subjected.  Complaint ¶ 51.

## DISCUSSION

### I. Summary Judgment:  General Principles

Summary judgment will be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists if "the record as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The burden of showing the absence of any genuine issue of material fact rests on the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Where the party opposing summary judgment is proceeding *pro se*, the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 536 (2[d] Cir. 1999). Nevertheless, "proceeding *pro se* does not otherwise relieve [opposing party] from the usual requirements of summary judgment." *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00-Civ.-8594, 2002 U.S. Dist. LEXIS 25166, at *5 (S.D.N.Y. Jan. 9, 2003); *see also Bumpus v. Canfield*, ___ F.Supp.2d ___, 2007 WL 2071607, at *2 (W.D.N.Y. July 20, 2007) (stating that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended") (quoting *Stinson v. Sheriff's Dep't of Sullivan County*, 499 F.Supp. 259, 262 (S.D.N.Y. 1980)).

## II. Exhaustion of Administrative Remedies

Defendants contend that plaintiff's claim of retaliation based on his removal from his job at the commissary and transfer to an educational program should be dismissed based on plaintiff's failure to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). The PLRA provides in part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.*

"DOCS's grievance process consists of three stages. First, a grievance is filed with the Inmate Grievance Resolution Committee ('IGRC'). Next, an inmate may appeal an adverse decision to the prison superintendent. Finally, an inmate may appeal the superintendent's decision to the

Central Office Review Committee ('CORC')." *Brownell v. Krom,* 446 F.3d 305, 309 (2[d] Cir. 2006).

The mere fact that an inmate plaintiff filed *some* grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit. *See Curry v. Fischer*, No. 02 CIV.4477, 2004 WL 766433, at *7 (S.D.N.Y. Apr. 12, 2004) ("But it is not enough to satisfy the PLRA's exhaustion requirement that *some* issue has been exhausted: there must be a connection between the administrative grievance and the matters raised in the federal court complaint"). Claims relating to matters that are outside the scope of the inmate's grievance, therefore, are not exhausted for purposes of the PLRA. *See*, *e.g.*, *Donahue v. Bennett*, No. 02-CV-6430, 2004 WL 1875019, at *7 (W.D.N.Y. Aug. 17, 2004) (where plaintiff's grievance was narrower than the allegations in his complaint, plaintiff's claim would be limited to what was contained in the grievance).

Here, plaintiff filed grievances about not being allowed to speak Spanish at the commissary and about his placement in IPC. Dkt. #26-2 at 10, 27. There appears to be no dispute that he also pursued those grievances fully, since the denial of both grievances was upheld by CORC. Dkt. #26-2 at 8, 25. Thus, those claims are exhausted.

There is no evidence, however, that plaintiff filed a grievance with regard to the alleged retaliatory transfer from his commissary job to an educational program. There is also no evidence that the DOCS officials who reviewed his grievances were aware of, investigated, or ruled on any such claim. *Cf. Baskerville v. Blot*, 224 F.Supp.2d 723, 730 (S.D.N.Y. 2002) (PLRA exhaustion requirement was satisfied despite the fact that "[t]he scope of the grievance that plaintiff filed ... was much narrower than the issues he [was] raising in the instant complaint," since the broader assault

claim raised in the federal suit had been investigated and ruled upon by the CORC, even though the underlying facts of the assault were not explicitly laid out in the grievance).  Plaintiff's claims based upon his transfer out of the commissary are therefore barred for failure to exhaust administrative remedies.

## III. Restriction on Use of Spanish

With respect to plaintiff's claim concerning his use of Spanish to converse with other inmates, defendants contend that inmates have no constitutional right to converse with each other in a particular language while they are working, and that Colvin's directive to plaintiff and his fellow inmates to use English was justified by legitimate security concerns.

As a general rule, prison regulations and restrictions on inmates' rights or activities will be upheld if they are "reasonably related to valid penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987).  In determining whether a particular regulation withstands scrutiny under that test, *Turner* instructs courts to consider four factors:  "whether the regulation has a valid, rational connection to a legitimate governmental interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) what impact an accommodation of the right would have on guards and inmates and prison resources;" and (4) "whether there are ready alternatives to the regulation."  The fourth factor depends on whether the "prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Overton v. Bazzetta*, 539 U.S. 126, 136 (2003).[6]

---

[6]This case does not involve an actual regulation; although plaintiff alleges that Colvin

(continued...)

There are few reported cases involving the application of the *Turner* factors in the context of restrictions on inmates' right to communicate in languages other than English. The courts that have done so have reached mixed results, turning on the particular facts of those cases, none of which is on all fours with the case at bar.

In *Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024 (8th Cir. 2004), the Court of Appeals for the Eighth Circuit upheld a rule that permitted inmates to engage in written communication with others outside the prison in a foreign language, but only if that was the only language in which the inmate could communicate with the other person. With respect to the first prong of the *Turner* test, the court stated that "[w]hile prisoners have a right to send and receive mail, prison officials have a legitimate interest in monitoring that mail for security reasons." *Id.* at 1026. Regarding the second *Turner* factor, the court found that there were alternative ways in which the plaintiff (a native Spanish speaker who was also fluent in English) could communicate with his family, such as telephone calls and personal visits. *Id.* at 1027.

---

⁶(...continued)
told him that the English-only rule was a DOCS policy, plaintiff himself asserts that there was no written rule to that effect. Complaint ¶¶ 21, 22. Although troubling that Calvin took it upon herself to announce a rule for inmate conduct, that fact alone is not dispositive. Even if Colvin acted entirely on her own initiative, however, the Court is still guided by the *Turner* factors, which other courts have also applied in the context of particular acts by individual prison authorities. *See Boles v. Neet*, 486 F.3d 1177, 1181 n.4 (10th Cir. 2007) ("Although plaintiff is not challenging a prison regulation per se, but rather Warden Neet's individual actions, *Turner* is no less applicable") (citing *Salahuddin v. Goord*, 467 F.3d 263, 274 n. 4 (2d Cir. 2006) ("[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise")); *VanDyke v. Southwest Virginia Regional Jail Auth.*, No. CIVA 7:06CV00267, 2006 WL 2475898, at *3 (W.D.Va. Aug. 25, 2006) (applying *Turner* factors to claim arising out of guard's confiscation of prisoner's crucifix because it had sharp points and could conceivably be used as a weapon).

Addressing the third and fourth factors, the court stated that a prison regulation may be invalidated "[i]f a ready alternative ... exists," but that "[t]he alternative, however, must not impose more than a *de minimis* cost on the prison system." *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)). The court stated that the plaintiff in *Ortiz* had not identified such an alternative, such as by showing what the cost of hiring an interpreter would have been, or whether other inmates could have interpreted the letters for free. *Id.*

In *Kikumura v. Turner*, 28 F.3d 592 (7th Cir.), *cert. denied*, 514 U.S. 1005 (1994), the Seventh Circuit held that the district court in that case erred in granting summary judgment for the Federal Bureau of Prisons on the inmate plaintiff's claim for injunctive and declaratory relief relating to a particular federal prison's policy of "summarily rejecting foreign language publications without making any effort to translate or screen such material ... ." *Id.* at 597. In so doing, the court stated that the prison's warden, who imposed the policy, "did not make an individualized determination about the danger posed by" the Japanese-language materials that had been sent to the plaintiff, and that there was thus no rational connection between the blanket rejection of those materials and the stated rationale for the policy, which was to maintain prison security. *Id.* at 598. The court added that the other *Turner* factors also "counsel[ed] strongly in Kikumura's favor," since the record, read in the light most favorable to the plaintiff, suggested that "the prison was rejecting Japanese publications sent to him without making any effort at all to screen them, translate them, or locate someone who could do either of those things." *Id.* at 599. *See also Thongvanh v. Thalacker*, 17 F.3d 256 (8th Cir. 1994) (evidence supported jury verdict in favor of Laotian-born inmate plaintiff on claim that state prison's ban on non-English correspondence violated his constitutional rights, where

there was evidence that Lao-language correspondence could have been routed through Iowa Refugee Service Center for translation at no cost to prison).

In contrast, the Seventh Circuit in *Boriboune v. Litscher*, 91 Fed.Appx. 498 (7th Cir. 2003), affirmed the district court's dismissal of a state prisoner's claim under § 1983 alleging that prison officials violated his rights when they disciplined him for communicating on the telephone in a language other than English without first receiving approval from his social worker.[7]  The court said that the defendants' stated need to control "secret means of communication" to help "prevent conspiracies and escapes" was "certainly a legitimate penological concern," and that "the prison's policy [wa]s reasonably related to its interest in maintaining security."  *Id.* at 500.  In reaching that conclusion, the court stated that it was "significant that the policy d[id] not prohibit *all* telephone communication in a language other than English," but "simply require[d] that an inmate must have prior permission before doing so," which "would presumably enable [the] prison to monitor his calls in a manner equivalent to the monitoring of English-language calls, if it thought this was advisable." *Id.*  The court added that the "policy also incorporate[d] reasonable limits:  it d[id] not, for example, affect Boriboune's ability to receive visits or mail from his family and friends."  *Id.*

The *Boriboune* court also distinguished its prior decision in *Kikumura*, stating that in that case, the court had "concluded only that 'summary exclusion of foreign language materials is unconstitutional,'" and that the court had "noted that [its] decision was 'narrowly limited' to the

---

[7]Rule 32.1 of the Federal Rules of Appellate Procedure now permits unrestricted citation of unpublished decisions that were issued on or after January 1, 2007.  Since *Boriboune*, which was not selected for publication, was issued in 2003, it is cited not for its precedential value (and would not be binding on this Court in any event, since it is from a different circuit), but simply as an illustration of the application of the *Turner* factors to a language restriction on inmates.

situation in which 'a prison makes no effort at all to accommodate the constitutional rights of prisoners native in languages other than English.'"  *Id.* (quoting *Kikumura*, 28 F.3d at 598).

As indicated, these reported cases provided limited guidance here, since each case of this type turns on its own set of facts.  *See Thornburgh*, 490 U.S. at 414 (noting "the express flexibility of the *Turner* reasonableness standard"); *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (*Turner* "requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoner's constitutional rights may be curtailed").  Nonetheless, these cases do demonstrate that restrictions on prisoners' non-English communication may be circumscribed in some situations without necessarily running afoul of the Constitution.

In the case at bar, I find as a matter of law that Colvin's directive to plaintiff and the other inmates working at the commissary that they speak to each other only in English did not give rise to a constitutional violation, and that defendants are entitled to summary judgment on this claim. First, the stated rationale for Colvin's order–to ensure her own safety–is indisputably legitimate.  *See Sisneros v. Nix*, 884 F.Supp. 1313, 1329 (S.D.Iowa 1995) (stating that state government's purpose in promulgating English-only rule for written correspondence to and from inmates, which was to promote prison security, was "unquestionably legitimate"), *aff'd in part, rev'd on other grounds in part*, 95 F.3d 749 (8th Cir. 1996).  In addition, the order not to speak Spanish was rationally related to that interest.  As Colvin states, and plaintiff does not dispute, she was alone in the commissary, the door to which was locked, with a number of convicted felons.  *See* Colvin Decl. ¶ 7.[8]  Under the

---

[8]Although plaintiff contends that other officers were in the general vicinity of the
(continued...)

circumstances, it was not unreasonable for her to take steps to prevent the inmates from conversing with each other in a language she could not understand. *Boriboune*, 91 Fed.Appx. at 500.  That is particularly so given the broad deference given to prison officials in matters of prison security. *See Whitley v. Albers*, 475 U.S. 312, 322 (1986); *Mason v. Peters*, 346 F.Supp.2d 396, 399 (W.D.N.Y. 2004).

Furthermore, plaintiff could still communicate in English with his co-workers.  So, the ban on Spanish communication had only a modest effect on plaintiff.

Assuming that plaintiff has *some* right to converse with fellow inmates in Spanish, I also find that Colvin's directive did not foreclose alternative means for plaintiff to exercise that right.  It appears from plaintiff's own papers that the restriction on his use of Spanish applied only while he was working in the commissary, and that he was generally free to communicate in Spanish elsewhere at Five Points. *See* Allah Depo. (Dkt. #18, Ex. A) at 70 ("you can speak whatever language you want" elsewhere at the facility).

The third *Turner* factor considers the impact that an accommodation of the asserted right would have on guards, inmates and prison resources.  One means of accommodating the asserted right here would be simply to allow the inmates at the commissary to converse freely in Spanish. That, however, would vitiate the very aim of Colvin's order, which was to prevent the inmates from carrying on conversations in Colvin's presence that she was unable to understand.

---

[8](...continued)
commissary, *see* Plaintiff's Mem. of Law (Dkt. #25) at 21, he does not appear to dispute that Colvin was the only officer in the room with plaintiff and the other inmate workers at the time in question.  Even if other officers were present, however, I would find as a matter of law that Colvin's directive was rationally related to a legitimate interest in her safety.

Conceivably, the asserted right could also be accommodated by having someone at the commissary who could serve as an interpreter for Colvin, or by seeing to it that only Spanish-speaking guards work there. That possibility implicates the fourth *Turner* factor, which is "whether there are ready alternatives to the regulation." It is plaintiff's burden, however, to show not only that such an alternative exists, but also that it would accommodate his rights "at *de minimis* cost to valid penological interests." *Victoria W. v. Larpenter*, 369 F.3d 475, 487 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 91). *See also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) ("placing the burden on prison officials to disprove the availability of alternatives ... [would] fail[] to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators"); *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992) (fourth *Turner* factor "requires the inmate to 'point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests'") (quoting *Turner*, 482 U.S. at 90-91). Plaintiff has failed to do so, and he has not demonstrated that any genuine issues of fact exist in this regard. This claim is therefore dismissed.

**IV. Qualified Immunity**

Even if the prohibition on non-English speech in the commissary was improper, defendants would nevertheless be entitled to summary judgment on this claim on the ground of qualified immunity, which protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

A government official sued in his official capacity is entitled to qualified immunity if: (1) the conduct in question is not prohibited by federal law; (2) the plaintiff's right not to be subjected to forbidden conduct was not clearly established at the time the conduct occurred; or (3) the defendant's action was objectively legally reasonable "in light of the legal rules that were clearly established at the time it was taken." *X-Men Security, Inc. v. Pataki*, 196 F.3d 56 (2$^d$ Cir. 1999).

As explained above, assuming *arguendo* that prison inmates have some right to communicate with each other in a non-English language, the parameters of that right are far from clear, and it is certainly unclear that plaintiff enjoyed such a right under the circumstances of this case. When the events giving rise to this claim occurred, then, the right asserted here was not clearly established, and defendants are therefore immune from liability for damages on this claim. *See Kikumura*, 28 F.3d at 596 ("Whatever we might think about the constitutionality of the warden's policy [of summarily rejecting incoming Japanese-language mail] ... it surely is not 'clearly established' that Warden Turner's actions violated Kikumura's constitutional rights"); *Conner v. Sakai*, 15 F.3d 1463, 1469 (9th Cir. 1993) ("if a reasonable official would not have realized that Conner was praying [in Arabic] but could have thought that he was simply communicating with humans regarding earthly subjects, Defendants ... would be entitled to qualified immunity"), *rev'd on other grounds*, 515 U.S. 472 (1995); *see also Maldonado v. City of Altus*, 433 F.3d 1294, 1316 (10th Cir. 2006) ("Plaintiffs have not called to our attention, nor have we found, any cases from either the Supreme Court or this

circuit establishing the right to speak a foreign language in the workplace. ... Thus, we affirm the district court's grant of qualified immunity to the individual defendants").

## V. Placement in Involuntary Protective Custody

Plaintiff claims that his transfer to IPC constituted unlawful retaliation for his filing of grievances and for his participation in the ADA action. To establish such a claim, plaintiff must show that (1) he engaged in constitutionally protected speech or conduct; (2) defendants took some adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *See Gill v. Pidlypchak*, 389 F.3d 379, 380 (2$^d$ Cir. 2004); *Dawes v. Walker*, 239 F.3d 489, 492 (2$^d$ Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

The Second Circuit has cautioned district courts to approach prisoner claims of retaliation "with skepticism and particular care." *Dawes*, 239 F.3d at 491. Such claims are "easily fabricated" because they can be asserted after virtually any adverse action taken against an inmate. *Id.* At the same time, however, direct evidence of retaliatory motive, which is "rarely available" in cases alleging unlawful retaliation, *Meyer v. Board of County Com'rs of Harper County, Oklahoma*, 482 F.3d 1232, 1244 (10th Cir. 2007); *United States v. Brown*, 937 F.2d 32, 36 (2$^d$ Cir. 1991), is not necessarily required, and a plaintiff may rely on circumstantial evidence to establish his claim. *See Bennett v. Goord*, 343 F.3d 133, 139 (2$^d$ Cir. 2003) ("where ... circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required"); *see, e.g.*, *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2$^d$ Cir. 1995) (circumstantial evidence, including, *inter alia*,

temporal proximity of inmate's filing of lawsuit and officer's issuance of allegedly false misbehavior report, sufficient to withstand summary judgment); *Jones v. Coughlin*, 45 F.3d 677, 680 (2[d] Cir. 1995) (evidence of sequence of events between inmate's protected activity and filing of allegedly false misbehavior report against inmate, together with other evidence, would permit trier of fact to infer that filing of false misbehavior report was retaliatory).

There is no dispute here that plaintiff's filing of grievances and participation in the ADA action were constitutionally protected conduct. *Gayle v. Gonyea,* 313 F.3d 677, 682-83 (2[d] Cir. 2002). Thus, the evidence in the record "clearly satisfies the first test because filing a grievance is protected activity." *Morales v. Mackalm*, 278 F.3d 126 (2[d] Cir. 2002) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (1996)).

With respect to the second prong, the Second Circuit has defined "adverse action," in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2[d] Cir. 2003)). The test is an objective one, and does not depend on whether the plaintiff himself was in fact deterred from continuing to file grievances. *Id.*

Discussing this test, the Second Circuit has observed that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 491 (quoting *Thaddeus X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc) (per curiam)). If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from

continuing to engage" in protected activity, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection."  *Dawes*, 239 F.3d at 493.

In the case at bar, plaintiff spent a total of seventeen days in IPC, from September 23 until October 10, 2004.  Plaintiff alleges that while he was in IPC, he was not allowed recreation time, that he was given food with meat in it (plaintiff apparently is a vegetarian), and that the area that he was kept in was uncomfortably cold.  Allah Depo. at 117-22.  He also testified that "[o]fficers was spitting in the food," although he provided no specifics as to when this occurred, which officers did this, or how plaintiff knew that they had done it.  *Id.* at 117.[9]

In support of their motion for summary judgment, defendants admit that Keefe filled out an IPC report and submitted it to the disciplinary office at Five Points for a hearing to determine whether IPC was warranted.  Keefe Decl. (Dkt. #20) ¶ 6.  Keefe contends, however, that he did so only after being "directed by Lieutenant Mark Valentino to follow up with a potential dangerous situation" between plaintiff and Shariff based on an incident that occurred while plaintiff and Shariff were both housed at Green Haven.  *Id.* ¶ 4.

Defendants also maintain that there is no evidence that Keefe acted out of retaliatory motives. Defendants state that plaintiff had not filed any grievances against Keefe himself, and that Keefe's only connection with plaintiff's grievances was that Keefe had investigated some of them. Defendants contend that plaintiff's seventeen-day stay in IPC was a "normal part of prison life," and

---

[9]Curiously, despite the alleged hardships that plaintiff suffered in IPC, plaintiff states that on March 17, 2005, he *asked* to be placed in protective custody "for fear of being 'set-up'" by Keefe.  Dkt. #26 ¶ 18; Dkt. #26-2 at 34.  That request was denied.  Dkt. #26-3 at 2.

that the IPC process in this case therefore cannot be considered "adverse action."  Defendants' Mem.

of Law (Dkt. #23) at 14 (citing *Sandin v. Conner*, 515 U.S. 472 (1995)).

With respect to the adverse-action requirement, defendants' reliance on *Sandin* is misplaced.

In *Sandin*, the Supreme Court held that disciplinary confinement does not implicate a liberty interest

for purposes of a *due process* claim unless that confinement "imposes atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life."  515 U.S. at 484.

That is not the standard for analysis of a First Amendment retaliation claim, however.  As

explained above, the validity of a retaliation claim turns not on the atypicality or harshness of an

inmate's confinement, but on whether that confinement would deter a similarly situated inmate of

"ordinary firmness" from exercising his constitutional rights.  *See Allah v. Seiverling*, 229 F.3d 220,

224 (3[d] Cir. 2000) (*Sandin* did not preclude inmate's claim alleging that he was kept in

administrative segregation in retaliation for filing civil rights suits against prison officials, since

"[r]etaliation may be actionable ... even when the retaliatory action does not involve a liberty

interest"); *Stanley v. Litscher*, 213 F.3d 340, 343 (7th Cir. 2000) (holding that plaintiff stated claim

for retaliatory transfer even though no liberty interest was implicated by transfer); *Osterback v.

Kemp*, 300 F.Supp.2d 1238, 1252 (N.D.Fla. 2003) (injury may be the chilling effect on a First

Amendment right, "rather than a specific harm such as additional confinement or the deprivation of

privileges") (quoting *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir.), *cert. denied*, 524 U.S. 936

(1997)).

Thus, courts have held that transfers to other facilities or housing units can satisfy the

adverse-action requirement; *see*, *e.g.*, *Gill*, 389 F.3d at 384 (inmate sufficiently alleged adverse

action, in the form of three weeks in keeplock); *Morales v. Mackalm*, 278 F.3d 126, 131-32 (2[d] Cir.

2002) (allegation that plaintiff was transferred to a psychiatric facility in retaliation for filing a sexual

harassment grievance against defendant "must be construed as describing an adverse action" for

purposes of motion to dismiss); *Davis v. Kelly*, 160 F.3d 917, 920 (2[d] Cir. 1998) ("prison authorities

may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Chavis*

*v. Struebel*, 317 F.Supp.2d 232, 238 (W.D.N.Y. 2004) ("transferring an inmate to another housing

unit or to a psychiatric facility or assigning the inmate a less desirable work assignment satisfies the

adverse action requirement").  I conclude, therefore, that plaintiff has presented sufficient evidence

with respect to the adverse-action requirement to survive a motion for summary judgment.  *See*

*Washington v. County of Rockland*, 373 F.3d 310, 320 (2[d] Cir. 2004) (agreeing with plaintiff that

whether threat of disciplinary proceedings against plaintiff constituted an adverse action "involved

a material issue of fact that should have been reserved for a jury") (non-prisoner employment case);

*Martinson v. Menifee*, No. NO. 02CIV.9977, 2007 WL 2106516, at *7 (S.D.N.Y. July 18, 2007)

("Defendants have not met their burden of showing that no genuine issue of material fact exists as

to whether or not the actions taken [against inmate] were adverse"); *Zaire v. Doe*, No. NO.

9:03-CV-629, 2006 WL 1994848, at *5 (N.D.N.Y. July 13, 2006) (finding that a reasonable jury

could conclude that defendant corrections counselor took some action against inmate plaintiff and

that "his action was adverse because it would deter a similarly-situated inmate of ordinary firmness

from exercising his constitutional rights," and concluding that "issues of material fact exist with

respect to the adverse-action prong of Plaintiff's retaliation claim").

With respect to the third prong–a causal connection between the protected activity and the adverse action–I find that plaintiff has demonstrated the existence of genuine issues of fact that preclude summary judgment, at least as to his claim against Keefe.  Plaintiff testified at his deposition that Keefe, who investigated several of plaintiff's grievances, evinced some antipathy toward inmate grievances in general, and that Keefe attempted to dissuade plaintiff from writing grievances.  Plaintiff stated that Keefe told him that Keefe would never "flip" on his fellow officers, *i.e.*, he would not "turn [on] or betray his officers ... ."  Allah Depo. at 88.  Plaintiff also testified that when he began submitting grievances about the lack of handicap accessibility in the facility, Keefe "came and said, 'I'm not going to be having this in my block,' and it's like I'm making him do work and he didn't want to do no work.  He just want to do his time and do his work and leave."  *Id.* at 87.  When asked if Keefe actually told him that or if that was simply what plaintiff had inferred, plaintiff responded, "No, that's what he said, that's what he said."  *Id.*[10]

Plaintiff also testified that when Keefe first told him that he was being moved to IPC, Keefe indicated that the transfer was related to an incident that occurred while plaintiff was confined at Green Haven in which plaintiff "g[o]t a ticket for burning somebody [sic] cell."  *Id.* at 99.  When told of this, plaintiff responded, "no, my cell got burned."  Keefe then "asked [plaintiff] about a lawsuit [apparently referring to the ADA action], he said you got a lawsuit pending, right.  ... Anything you want to let me know about that[?]"  Plaintiff asked, "what are you getting at[?]," but Keefe did not respond.  *Id.*

---

[10]Plaintiff gave similar testimony later in his deposition, stating that Keefe told him "that he's not going to have ... me writing all these grievances in this block, ... he's not going to have that, ... this got to stop."  Allah Depo. at 115.

Plaintiff testified that Keefe spoke to him again about these matters sometime later, stating, "well, you know, you could work with us drop that lawsuit and work with us." *Id.* at 101.   When plaintiff demurred at this suggestion, Keefe allegedly responded, "I can make it hard for you down here." *Id.*[11]

At the IPC hearing, plaintiff testified that he had never had any problems with Shariff, stating, "me and Shariff always been cool."   Dkt. #26-2 at 20.   According to plaintiff, both his and Shariff's cells at Green Haven had been set on fire by a third inmate, who was later caught.   *Id.*   The hearing officer asked, "how did this [apparently referring to the arson incident] come to light at this point do you know?," to which plaintiff opined in response that "it's a retaliation" because plaintiff and Shariff had "both put complaints in ... ."   *Id.* at 20-21.   Plaintiff surmised that "they're lookin through the files" to see if a reason could be found to "get [plaintiff] out of here" by "[m]ak[ing] up a bogus ass charge ... ."   *Id.*

Plaintiff has also submitted an affidavit of Shariff, who states that he and plaintiff are friends, and that they socialized together both at Green Haven and at Five Points.   Shariff states that on one occasion, he was present, in his capacity as an inmate representative on the IGRC at Five Points, at a hearing on one of plaintiff's grievances.   Keefe was also present at the hearing.   Shariff states that after plaintiff left the hearing room, Keefe stated that "he didn't like" plaintiff.   Dkt. #26-3 at 17. Shariff states that Keefe told "the grievance reps ... [that they were] not to do anything for" plaintiff, and that Keefe also told the grievance officer to "make it hard for" plaintiff.   *Id.*   When Shariff and

_____

[11]Keefe also allegedly told plaintiff during this conversation that Keefe had worked in the medical unit at Five Points before he was promoted to sergeant.  Allah Depo. at 101.  Some of the defendants in the ADA suit in which Allah is a plaintiff are members of the Five Points medical department.  *See* 05-CV-06504, Dkt. #84 ¶¶ 21-33.

the other inmate representative questioned Keefe's order, Keefe allegedly "threatened [them] with write-ups or being fired ... ." *Id.*

Viewing the evidence in the light most favorable to plaintiff, the nonmoving party, and drawing all reasonable inferences in his favor, I find that plaintiff has made a sufficient showing to withstand defendants' motion for summary judgment as to his retaliation claim against Keefe.  The evidence suggests that Keefe may have harbored some animus against plaintiff for his grievances and his participation in the ADA action, and that contemporaneously with Keefe's submission of the report that led to plaintiff's seventeen-day stay in IPC pending a hearing, Keefe made several allusions to plaintiff's pending lawsuit, and suggested that plaintiff "drop" the suit.[12]

In addition, the timing of the IPC proceedings was curious:  the arson incident occurred in February 2003, Dkt. #26-3 at 17, and the IPC recommendation came in September 2004, by which time both plaintiff and Shariff had been at Five Points, without incident, for well over a year.  The hearing officer himself openly wondered how the arson incident "c[a]me to light at th[at] point," and at the conclusion of the hearing (at which plaintiff was the only witness), the hearing officer dismissed the IPC recommendation, stating to plaintiff, "you have been here for a considerable amount of over a year, close to a year and a half, you haven't had any problems, Shariff's been here the whole time ... ."  Dkt. #26-2 at 24.  He also noted that never during that period had Shariff been

---

[12]There is also evidence contradicting defendants' assertion that plaintiff had not filed any grievances against Keefe prior to Keefe's recommendation in September 2004 that plaintiff be placed in IPC.  Plaintiff has submitted a copy of a grievance that he filed in June 2004, in which he made certain allegations against a "Sgt. Keith."  Dkt. #26-3 at 10-12.  Plaintiff states that he intended this as a reference to Keefe, Dkt. #25 at 29, and the IGRC apparently understood it as such, since their response refers to Keefe, not "Keith."  Dkt. #26-3 at 13.

on plaintiff's "separatee" list, apparently meaning a list of inmates from whom plaintiff should be kept separated.  *Id.*

It is also worth noting that not only were there apparently no problems between plaintiff and Shariff, but the two of them were also plaintiffs in the ADA action.  Plaintiff's placement in IPC would presumably have severely limited, if not completely curtailed, contact between him and Shariff.

This is not to suggest that Keefe did necessarily act for reasons of retaliation.  As stated, Keefe contends that he investigated the Green Haven arson incident not on his own initiative, but at the direction of a superior, Lt. Valentino.  He also denies retaliating against plaintiff in any way. Keefe Decl. ¶¶ 4, 8.  These conflicting versions of the facts, however, present questions of credibility that cannot properly be resolved on a motion for summary judgment.  *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2$^d$ Cir. 2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2$^d$ Cir. 1997)); *Graham v. Henderson,* 89 F.3d 75, 80 (2$^d$ Cir. 1996) (whether inmate's punishment was retaliatory "runs to matters of credibility and weight of the evidence, which are matters for the jury and should not be decided on summary judgment"); *Mendez v. Radec Corp.*, 232 F.R.D. 78, 84 (W.D.N.Y. 2005) ("The parties' versions of the relevant facts, as set forth in their affidavits, differ sharply from each other, and the Court cannot resolve those differences without weighing the affiants' credibility, which would be inappropriate on a motion for summary judgment").[13]

---

[13]Defendants do not appear to raise a qualified-immunity defense as to this claim, but in

(continued...)

I also find, however, that the other defendants are entitled to summary judgment on this claim. Plaintiff's complaint does not differentiate among the five defendants with respect to his Spanish-language and retaliation claims, but it is obvious that some defendants, such as Colvin, played no role whatsoever in the events giving rise to the retaliation claim. The only defendant other than Keefe who is even mentioned in connection with the retaliation claim is Napoli, but the only allegations concerning him are that Napoli, as Deputy Superintendent of Security, "approve[d] the recommendation [for IPC] submitted by Sgt. Keefe without reviewing the facts," and that Napoli and Keefe conspired together to retaliate against plaintiff. Complaint ¶ 46.[14] Those allegations are insufficient to show personal involvement in the alleged violation on the part of Napoli, as explained

---

[13](...continued)
any event I find that Keefe is not entitled to qualified immunity. It has long been established in this circuit that otherwise lawful actions can be unlawful if they are undertaken in retaliation for an inmate's exercise of his rights. *See, e.g., Gill v. Mooney*, 824 F.2d 192 (2[d] Cir. 1987); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2[d] Cir. 1986); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2[d] Cir. 1983); *Hohman v. Hogan*, 597 F.2d 490 (2[d] Cir. 1979). That includes transfer to a different facility or unit, as explained in the discussion of the merits of plaintiff's claim, *supra*. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2[d] Cir. 1989) ("Retaliatory transfers were clearly illegal in 1980"); *Lipton v. County of Orange*, 315 F.Supp.2d 434, 460-61 (S.D.N.Y. 2004) (jail administrator was not entitled to qualified immunity from liability for transferring pretrial detainee to less desirable facility in alleged retaliation for detainee's exercise of First Amendment rights, since right to be free from retaliation for exercise of such rights was clearly established, and there was evidence that jail administrator acted with unlawful intent); *Hernandez v. Goord*, 312 F.Supp.2d 537, 548-49 (S.D.N.Y. 2004) (defendants' alleged improperly-motivated prison transfers in retaliation for inmate's exercise of his First Amendment rights violated clearly established law, making qualified immunity unavailable).

[14]Plaintiff alleges that the IPC hearing officer, Captain Colvin (who is not a defendant), was the husband of defendant Crystal Colvin, Complaint § 42, but plaintiff states that Captain Colvin dismissed the IPC recommendation after determining that "there exist[ed] no need for protection ... ." Complaint ¶ 44. In his papers in opposition to defendants' summary judgment motions, plaintiff does make certain other allegations about Captain Colvin concerning events that took place after the filing of the complaint in this action, but those claims are not properly asserted and are dismissed, as explained in n. 15, *infra*.

in Part VI of this Decision and Order, *infra*.  In addition, the conclusory allegation that Napoli

conspired with Keefe is not supported by any facts.  *See Walker v. Jastremski*, 430 F.3d 560, 564 n.

5 (2$^d$ Cir. 2005) ("conclusory or general allegations are insufficient to state a claim for conspiracy

under § 1983"), *cert. denied*, 547 U.S. 1101 (2006); *Young v. Shipman*, No. 3:05-CV-551, 2007 WL

1064316, at *1 (D.Conn. Mar. 30, 2007) ("The conspiracy claim is dismissed because plaintiff's

vague, unsupported allegations of conspiracy are insufficient to withstand a motion for summary

judgment").  Plaintiff may therefore proceed on his retaliation claim only against Keefe.

I also note that in addition to his First Amendment retaliation claim, plaintiff asserts in the

complaint, in conclusory fashion, that defendants' actions violated the Fourth, Fifth, Sixth and

Eighth Amendments to the United States Constitution.  Complaint ¶ 49.  To the extent that the

retaliation claim is premised on these other constitutional theories, they are dismissed.

Other than this one reference, plaintiff's papers do not appear to mention the Sixth

Amendment, which has no application to this case.  With respect to the Fourth Amendment, plaintiff

explains in his memorandum of law that this claim is premised on the allegation that Keefe lacked

probable cause to place him in IPC.  That claim fails, however, because plaintiff's seventeen-day stay

in IPC, which did not involve any unusually harsh conditions, did not implicate a constitutionally

protected liberty interest.  Plaintiff's Fifth Amendment due process claim fails for the same reason.

*See Resnick v. Hayes*, 213 F.3d 443, 447-49 (9th Cir. 2000) (because plaintiff had no liberty interest

in being free from confinement in Special Housing Unit ("SHU") pending his disciplinary hearing,

he failed to state Fourth Amendment or due process claim).  Although plaintiff alleges that the

conditions of his IPC confinement were less than ideal, he has not shown that they were so atypical

compared to ordinary prison life as to give rise to a protected liberty interest, particularly in light of the relative brevity of that confinement. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2[d] Cir. 2004) ("under abnormal or unusual SHU conditions, periods of confinement of less than 101 days may implicate a liberty interest"), *cert. denied*, 543 U.S. 1187 (2005); *Sealey v. Giltner*, 197 F.3d 578, 586 (2[d] Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval ... might ... be atypical") (citation omitted)). *See, e.g.*, *Stankowski v. Farley*, 487 F.Supp.2d 543, 563 (M.D.Pa. 2007) (plaintiff's allegation that segregation unit was cold and had a leaking sink did not show "atypical and significant hardship" giving rise to protected liberty interest); *Ford v. Phillips*, No. 05 CIV. 6646, 2007 WL 946703, at *10 (S.D.N.Y. Mar. 27, 2007) (granting summary judgment on inmate's claim that he was denied recreation, showers, and a special meal on four occasions; "These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest"); *Gilmore v. Goord*, 415 F.Supp.2d 220, 223 (W.D.N.Y. 2006) ("plaintiff was kept in administrative segregation for nineteen days.  In the absence of some unusually harsh conditions of confinement, that alone does not implicate a protected liberty interest"); *Johnson v. Lappin*, No. 05-900, 2006 WL 3743120, at *1-*2 (S.D.Ill. Dec. 18, 2006) (plaintiff's six-day confinement in "dry cell," where he was allegedly denied personal hygiene items, causing a rash and a gum infection, and was exposed to low temperatures without adequate clothing, causing headaches and sore throats, did not impose "an atypical and significant hardship in relation to the ordinary incidents of prison life"); *Somerville v. Dretke*, No. 7:04-CV-185, 2004 WL 2421610, at *1 (N.D.Tex. Oct. 26, 2004) ("The temporary

loss of recreation, commissary and cell privileges presents no issue of constitutional magnitude. Inmates generally do not have protected liberty interests in their privileges").

To the extent that plaintiff's IPC claim is premised upon the Eighth Amendment, it is also subject to dismissal. Plaintiff has not alleged living conditions in IPC that "jeopardize[d his] health or safety" so as to give rise to an Eighth Amendment claim. *Johnson v. Hannah*, 421 F.Supp.2d 604, 607 (W.D.N.Y. 2006). *See Stankowski*, 487 F.Supp.2d at 575 n. 28 ("Plaintiff apparently contends that the Eighth Amendment was violated because the segregation unit had cold air ducts constantly blowing and had a leaking sink. These allegations do not state an Eighth Amendment claim"); *Zimmerman v. Seyfert*, No. 9:03-CV-1389, 2007 WL 2080517, at *29 (N.D.N.Y. July 19, 2007) ("the allegations in the Amended Complaint that Defendant Karamonos 'spit' in Plaintiff's food and poked his finger in Plaintiff's food are conclusory and unsubstantiated. ... Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal"). Furthermore, plaintiff has not alleged that any of the defendants in this action were personally involved in creating such conditions or permitting them to exist.


**VI. Claims Against Poole and Napoli**

To make out a claim against a particular defendant under § 1983, plaintiff must establish the defendant's personal involvement in the alleged constitutional deprivation. *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2$^d$ Cir. 2001); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2$^d$ Cir. 2001). A supervisory official's personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being

informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2[d] Cir. 1995); *Williams v. Smith*, 781 F.2d 319, 323-24 (2[d] Cir. 1986).

Plaintiff has failed to establish Poole's or Napoli's personal involvement under these standards.  The only mention of Poole or Napoli in the factual allegations in the complaint is in the context of defendant Colvin's alleged statement that Poole and Napoli had instructed supervisors to enforce an English-only rule in inmate work areas, Complaint ¶ 22.  The record also shows that Poole affirmed the denial of plaintiff's grievance concerning this matter on the ground that although prison rules "d[id] not specify inmates cannot speak Spanish," the rules did require inmates to obey any orders given them by facility personnel. Dkt. #26-2 at 9.  Aside from the fact that Colvin's alleged statement is hearsay as to Poole and Napoli, the Court has dismissed the Spanish-language claim on the merits, so whether they were personally involved in these events is immaterial.

Plaintiff's response to defendants' motion does contain evidence that Poole and Napoli sent and received some correspondence concerning some other matters involving plaintiff, but these also fail to establish their personal involvement for purposes of plaintiff's § 1983 claims.  With respect to Napoli, the record contains a copy of a memorandum from Napoli to plaintiff dated March 18, 2005, stating that plaintiff's complaint against Keefe had been investigated by a certain officer, and

that there was "no evidence or witness testimony" to support plaintiff's allegations.  Dkt. #26-3 at

2.  In addition, Napoli sent plaintiff a memorandum dated October 1, 2004, which merely stated that

plaintiff should make his concerns about his IPC status made known at his upcoming IPC hearing.

Dkt. #26-2 at 29.  Otherwise, there is virtually no evidence of anything that Napoli did in connection

with the events underlying plaintiff's claims.

      With respect to Poole, the record shows that in a letter dated July 15, 2004, Annie Rody-

Wright, Esq., the Legal Director of the Center for Law & Justice, Inc. in Albany, New York asked

Poole to give his "immediate attention" to alleged harassment and other wrongs that plaintiff had

allegedly been suffering at the hands of three correctional officers, none of whom are parties to the

instant lawsuit.  Dkt. #26-3 at 8.  Poole responded to Rody-Wright by letter dated August 18, 2004,

stating that "every issue you addressed has been investigated and taken care of at the facility."  Dkt.

#26-3 at 14.  He stated that Allah had been interviewed and had "stated that things have gotten better

for him in the block at this time."  Poole added that "[t]here is no proof regarding his allegations."

*Id.*

      In a letter dated October 5, 2004, a staff attorney from The Legal Aid Society in New York

City wrote to Poole concerning plaintiff's placement in IPC, asking Poole to "review Mr. Allah's

case and remove him from PC."  Dkt. #26-3 at 4.  There is no indication if Poole or any other official

at Five Points responded to this letter.

      On March 17, 2005, plaintiff sent a letter to Poole complaining about his ongoing problems

with Keefe.  Dkt. #26-2 at 34.  Plaintiff received a response from Napoli stating that his complaint

had been investigated by a Lt. Giannino and found to be meritless.  Dkt. #26-3 at 2.

None of these letters show personal involvement on Napoli's or Poole's part.  "Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord*, 310 F.Supp.2d 550, 555 (W.D.N.Y. 2004).  *See*, *e.g.*, *Sealey v. Giltner*, 116 F.3d 47, 51 (2[d] Cir. 1997) (summary judgment affirmed where DOCS commissioner referred plaintiff's letter to prison superintendent); *Farid v. Goord*, 200 F.Supp.2d 220 (W.D.N.Y. 2002) (dismissing action against DOCS commissioner and prison superintendent for lack of personal involvement where plaintiff merely sent petition to them and each referred the petition down the chain of command for investigation).

Furthermore, as to the October 5, 2004 letter to Poole from the Legal Aid Society, plaintiff was ordered removed from IPC on October 7, so there was no need to respond to the letter.  The July 15, 2004 letter from Rody-Wright concerned matters that do not appear to have any direct connection with the events giving rise to this action.  Finally, Poole's and Napoli's supervisory status alone is not enough to establish their personal involvement, since the doctrine of *respondeat superior* does not apply to § 1983 cases.  *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2[d] Cir. 1989); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007).


## VII. Claims not Contained in the Complaint

In his papers in opposition to defendants' motion, plaintiff attempts to raise, or at least discusses, a number of claims and factual allegations that are not set forth in the complaint.  "It is well established, however, that a memorandum of law or other motion papers are not proper vehicles

by which to raise claims that are not asserted in the complaint." *Flemming v. Wurzberger*, 490 F.Supp.2d 320, 324 (W.D.N.Y. 2007). *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F.Supp.2d 489, 495 (W.D.N.Y. 2007); *Anderson v. Aset Corp.*, 329 F.Supp.2d 380, 383 (W.D.N.Y. 2004). Accordingly, all such claims are dismissed. *See Flemming*, 490 F.Supp.2d at 324.[15]

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #17) is granted in part and denied in part. All of plaintiff's claims, other than his claim against defendant Joseph Keefe arising out of plaintiff's transfer to Involuntary Protective Custody in September 2004, are dismissed. In all other respects, the motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        August 14, 2007.

---

[15]Some of these allegations relate to events that occurred after the filing of the complaint in this action. For example, plaintiff alleges that in 2006, he was assaulted by certain officers, and that he was placed in the Special Housing Unit based on a falsified misbehavior report, following a hearing before Capt. Colvin. Dkt. #25 at 16-17. Although such claims might be asserted by way of a supplemental complaint, *see* Fed.R.Civ.P. Rule 15(d); *Gudema v. Nassau County*, 163 F.3d 717, 723 (2[d] Cir. 1998), plaintiff has made no application for leave to file a supplemental complaint, and it appears that it would futile to grant such leave at this point, since there is no indication in the record that plaintiff has exhausted his administrative remedies as to these matters.